UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK MARTIN KING, | ) | CASE NO. 5:18-CV-1283 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| ANDREW M. SAUL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Derrick King ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed on October 16, 2018, Plaintiff asserts that the administrative law judge ("ALJ") made several errors warranting a remand of his case. ECF Dkt. #20. On December 17, 2018, Defendant filed a brief on the merits. ECF Dkt. #23. Plaintiff subsequently filed a reply to Defendant's brief on January 4, 2019. ECF Dkt. #26. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's case in its entirety WITH PREJUDICE.

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.      Initial ALJ Decision

Plaintiff protectively filed an application for DIB in January 2012 and an application for SSI in February 2012, alleging disability beginning December 24, 2011 due to diabetes, hypertension, and bleeding into the brain. ECF Dkt. #12 ("Tr.")[2] at 153, 162,  267, 269, 324.

---

[1]On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security, replacing acting Commissioner Nancy A. Berryhill.

[2] All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled. This allows the Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

Plaintiff's applications were denied initially on May 1, 2012 and upon reconsideration on August 23, 2012. *Id.* at 161, 170, 182, 192. On October 3, 2012, Plaintiff requested an administrative hearing. *Id.* at 209. On January 22, 2014, Plaintiff executed a waiver of representation prior to the hearing. *Id.* at 257.

On January 22, 2014, a hearing was held before an ALJ in which Plaintiff, without counsel, and a vocational expert ("VE") testified. Tr. at 105. The ALJ issued his decision on February 4, 2014, finding Plaintiff not disabled and denying his applications for DIB and SSI. *Id.* at 84-99. Plaintiff requested a review of the hearing decision, and on November 19, 2015, the Appeals Council denied review. *Id.* at 1-4, 82.

After Plaintiff filed suit in federal district court, the parties agreed on May 16, 2016 to a joint stipulation to remand the case pursuant to Sentence Four of 42 U.S.C. § 405(g). Tr. at 1178-79; 42 U.S.C. § 405(g) (Sentence Four states: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). The Court accepted the stipulation and remanded the matter back to the Commissioner for further administrative proceedings. *Id*. at 1177. On July 11, 2016, the Appeals Council issued an order vacating the decision of the Commissioner and remanded the case to an ALJ to consider evidence from the Ohio Department of Job and Family Services ("ODJFS"), which awarded Plaintiff financial assistance benefits. *Id.* at 1031, 1180-84.

### B.    Subsequent ALJ Decision

Following the May 16, 2016 remand of this matter to the same ALJ, a second hearing was held on February 21, 2017. Tr. at 1058-1101. On April 10, 2017, the ALJ issued a decision, again finding Plaintiff not disabled and denying Plaintiff's applications for DIB and SSI for the period of December 24, 2011, the alleged onset date, through the date of the second decision. *Id.* at 1028-42.

On June 6, 2018, Plaintiff filed the instant suit seeking review of the ALJ's second decision. ECF Dkt. #1. On August 21, 2018, Defendant filed an answer. ECF Dkt. #11-1, 13. Plaintiff filed a brief on the merits on October 16, 2018. ECF Dkt. #20. On December 17, 2018,

Defendant filed a merits brief. ECF Dkt. #23. Plaintiff filed a reply brief on January 4, 2019. ECF Dkt. #26.

## II. MEDICAL AND TESTIMONIAL EVIDENCE

### A. Medical Evidence

On December 24, 2011, the alleged disability onset date, Plaintiff presented to the emergency room at Summa Akron City Hospital due to complaints of a 5-day history of loss of balance, right hand numbness, elevated blood pressure, mild head pressure, and a fall. Tr. at 488, 528-29, 721. Upon examination and testing, attending doctors found that Plaintiff was hypertensive and had intracerebral hemorrhage, new onset diabetes type 2, hepatic hypodensity, hyperlipidemia, and anemia. *Id.* at 488-90, 503, 577-79. A CTA head scan from December 25, 2011 revealed no definite evidence of aneurysm or arteriovenous malformation. *Id.* at 482, 577, 895-96. Plaintiff was discharged from the hospital on December 29, 2011 with seven discharge medications. *Id.* at 488-90, 651-56.

On January 9, 2012, Plaintiff presented to neurologist Dr. Krishna Satayan, M.D., for a follow up visit. Tr. at 591, 652. Dr. Satayan noted that Plaintiff denied any headache, nausea or vomiting and was walking around and eating well. *Id.* at 591. Upon physical examination, Dr. Satayan found Plaintiff to be wide awake, alert, oriented, walked with a normal gait, and moved all of his extremities well. *Id.*

Plaintiff stated that he did not have a primary care physician prior to his hospitalization in December 2011. ECF Dkt. #20 at 9. On January 13, 2012, Plaintiff established care with Dr. Charles Dhyanchand as his treating physician. Tr. at 598-603, 611. Plaintiff presented again for a follow up visit on February 10, 2012 and Dr. Dhyanchand noted that Plaintiff denied paralysis, weakness, dizziness, headaches, and confusion but that his blood pressure was not well-controlled. *Id.* at 614-15, 625. Subsequently, Dr. Dhyanchand completed forms for Plaintiff's disability applications with the Social Security Administration ("SSA") and the ODJFS. *Id.* at 598-610, 614. He checked all the boxes for activities in which Plaintiff could participate, except for "Employment with no restrictions." *Id.* at 604. He found Plaintiff's abilities to stand, walk, sit, lift, and carry were not affected and other functions to be "not significantly limited" based on

3

his physical exam. *Id.* at 606. Notably, Dr. Dhyanchand opined that he believed Plaintiff was employable and expected Plaintiff's functional limitations to only last between 30 days and 9 months. *Id.* at 606.

The record reveals that Plaintiff also visited Dr. Dhyanchand on the following dates: June 4, 2013; June 25, 2013; July 23, 2013; October 22, 2013; May 20, 2014; September 23, 2014; December 23, 2014; and April 14, 2015. *Id.* at 627, 630, 637, 953, 1829, 1833, 1838, 1841. On June 4, 2013, Dr. Dhyanchand noted that Plaintiff was not taking any medication related to the stroke symptoms from 6 months prior, blood pressure was not well-controlled, that Plaintiff was "seeking disability for vague reasons," occasional headaches and fatigue after standing for a time, and blood glucose levels revealed variable control. Tr. at 627. Shortly thereafter, on June 25, 2013, Dr. Dhyanchand noted Plaintiff has no known hypoglycemic episodes, blood glucose levels revealed variable control, his adherence to the treatment regimen was excellent and responses to medications were good. *Id.* at 630. Dr. Dhyanchand's progress notes on July 23, 2013 remained unchanged, except an additional note that Plaintiff complained of "neuropathy/foot complications" and "tingling/ burning of toes." *Id.* at 637. Due to this complaint, Dr. Dhyanchand performed a diabetic foot exam, which revealed no abnormalities. *Id.* at 638.

Also, at Plaintiff's request, Dr. Dhyanchand wrote a referral on June 25, 2013 for a physical therapist to conduct a Functional Capacity Evaluation ("FCE"). ECF Dkt. #20 at 9; Tr. at 952, 957-58. On August 14, 2013, physical therapist David Skrajner completed a FCE. Tr. at 639-47, 933-41. Mr. Skrajner opined that Plaintiff exhibited normal performance with a majority of his functional tests and he performed at a Light Physical Demand Level during the lifting portion of the exam, his pattern of symptoms suggested possible intermittent claudication that would need to be confirmed by further testing and examination. *Id.* at 640. He further opined that "it would be unlikely that [Plaintiff] could tolerate a job of his previous physical demand level," which required a "long period of standing." *Id.* at 640, 642.

Plaintiff requested Dr. Dhyanchand to refer him for an echocardiogram, which he underwent on November 19, 2013 with Dr. Brian Donelan. ECF Dkt. #20 at 9; Tr. at 942-43. Dr. Donelan concluded that Plaintiff had concentric left ventricular hypertrophy, normal left

4

ventricular systolic function, and bicuspid aortic valve with mild stenosis and no insufficiency. Tr. at 943.

On October 22, 2013, Dr. Dhyanchand referred Plaintiff to physical therapy. Tr. at 950. On December 19, 2013[3], Plaintiff visited physical therapist Scott Kline who noted that Plaintiff was able to walk over 15 minutes with minimal pain but then had increased claudation although he did well overall. *Id.* at 945-46. Mr. Kline discharged Plaintiff because he completed the program, 95% of goals were met, and his progress plateaued. *Id.* at 946.

Plaintiff presented to Dr. Dhyanchand for several follow up visits on October 22, 2013, December 27, 2013, May 20, 2014, and September 23, 2014 for medication refills and the progress notes were consistent with earlier records. *See* tr. at 947-49, 953-56, 1829-37. During a December 23, 2014 visit, Dr. Dhyanchand noted that Plaintiff had "a bad flu" but was doing better. *Id.* at 1838. During his last follow up visit with Dr. Dhyanchand on April 14, 2015, he noted that Plaintiff's diet for his diabetes was "poor" due to eating "junk food." *Id.* at 1841. He also found diastolic dysfunction with angina and diagnosed Plaintiff with Chronic Diastolic Heart Failure, referring Plaintiff to a cardiologist. *Id.* at 38, 1844.

Dr. Dhyanchand provided responses to medical interrogatories dated November 22, 2016. Tr. at 2190-97. Notably, under question 11, Dr. Dhyanchand wrote "unable to complete remainder of form due to no evidence in chart, such as FCE, to support," and the remainder of the form, which includes questions about specific limitations, was left blank. *Id.* at 2192-96.

On May 20, 2015, Plaintiff established care with cardiologist David Cutler, M.D., who noted that Plaintiff had "a number of issues including interest in seeking disability." Tr. at 1845. Dr. Cutler reviewed his history of illnesses and noted that Plaintiff's primary complaint was exertional problems in his legs. *Id.* Dr. Cutler examined Plaintiff and stated that "[a]t this point, I cannot give any opinion [regarding disability] until I have some test results back. At the moment, I do not see any clear cardiovascular cause for disability, but again, I will wait until I

---

[3] Plaintiff noted in his merits brief that he visit Mr. Kline over the course of six weeks for 13 treatment sessions. ECF Dkt. #20 at 10. However, the record only contains the discharge summary of December 19, 2013. Tr. at 945-46. Plaintiff's assertion appears to be consistent with the timeline due to his October 22, 2013 referral to physical therapy. Tr. at 950-51.

get further test results." *Id.* at 1846. He also ordered a lower extremity - ABI, resting procedure and stress test for Plaintiff, scheduled for the following week. *Id.* at 49-50, 52. On May 27, 2015, Dr. Cutler performed the pharmacological stress test with myocardial perfusion imaging, which revealed normal findings. *Id.* at 1848-49.

Plaintiff subsequently changed his primary care physician. ECF Dkt. #20 at 9; Tr. at 1850. On August 26, 2015, Plaintiff presented to nurse Kristina Robinson, CNP, to establish care at SPI New Seasons Family Medicine, and who found mostly normal findings upon a routine physical examination, except for a heart murmur. Tr. at 1850-54. Plaintiff presented at the same facility for a follow up visit on September 11, 2015 to establish care with his new treating physician, Dr. Roberto Lebron, M.D. *Id.* at 1855, 1859. Dr. Lebron examined Plaintiff and did not hear a heart murmur and noted other normal findings. *Id.* at 1861. Dr. Lebron focused on Plaintiff's diabetes and ordered a "POCT Glucose" and requested a follow up visit in 4 weeks to check sugar levels. *Id.* at 1859, 1862. Plaintiff followed up with Dr. Lebron for a foot exam and refill test strips testing on November 13, 2015 and for other follow up visits on December 28, 2015 and December 6, 2016. *Id.* at 1909-17, 1924-30, 2198-2202.

Pursuant to a referral from Dr. Lebron, Plaintiff visited SPI Sports Medicine Akron on November 3, 2015 due to complaints of lower back pain. ECF Dkt. #20 at 10; Tr. at 1894. Dr. Benjamin Burkam, M.D. examined Plaintiff during this visit and made normal findings except for a decreased range of motion and tenderness in Plaintiff's lumbar back. Tr. at 1894-97. Dr. Burkam stated that Plaintiff's symptoms were consistent with lumbar strain/hamstring tension and diagnosed him with (1) low back pain with radiation, unspecified laterally (primary diagnosis) and (2) hamstring tightness of both lower extremities. *Id.* at 1897-98. He recommended physical therapy, rest, using ice and OTC Tylenol or Nsaids. *Id.* at 1897. Plaintiff followed up with Dr. Burkam on December 1, 2015. *Id.* at 1918-23.

Plaintiff began physical therapy on November 6, 2015 with Michael Golz. Tr. at 1901. On December 4, 2015, Mr. Golz discharged Plaintiff from physical therapy due to improvement in his symptoms and most of his goals were met. *Id.* at 1905-08.

On August 18, 2016, occupational therapist ("OT") Carol Little completed an initial Functional Capacity Assessment. Tr. at 1931. In her detailed report, Ms. Little opined that Plaintiff had some functional limitations and medical issues limiting the type of work he can perform despite over-guarding and self-limiting behavior in the strength and endurance tests. *Id.* at 1941. She opined that Plaintiff could perform work at the Sedentary to Light Levels of exertion but he cannot tolerate standing and walking for prolonged periods of time, is not able to repetitively lift or carry heavy objects, cannot squat, stoop, crouch, lift from floor to knuckle or floor to waist, and has poor endurance due to being deconditioned. *Id.* Lastly, on March 9, 2017, Plaintiff visited Dr. Arif Ahmed, M.D. at SPI New Seasons Family Medicine for POCT Glucose testing. Tr. at 2203-2211.

### B.      Testimonial Evidence

After the District Court remanded the case back to the ALJ, a second hearing was held on February 21, 2017, in which Plaintiff, without counsel present, and VE Daniel Simone testified. Tr. at 1058. Plaintiff testified that his current medications were Lisinopril and Metoprolol Tartrate for hypertension, Aspirin for his heart, Metformin, Insulin, Novolog, Lantus, Exenatide injections, and Invokana for diabetes, Phenolfibrite for hyperlipidemia, Gabapentin for neuropathy in his feet, and Atorvastatin for cholesterol. *Id.* at 1065-66, 1069, 1072-73. He testified that due to neuropathy, he could stand and walk for 15 minutes straight before needing to sit down. *Id.* at 1069-70. He also stated that his blood pressure had been stable for the last couple of years. *Id.* at 1070. When asked by the ALJ what limitations he would have in a work setting, Plaintiff responded that it would be "mostly the standing and walking [as] the main issues." *Id.* at 1075. Plaintiff further testified that he lives with his mother. Tr. at 1076. His activities include taking care of the dogs, cutting the grass once a week, cooking for himself, some cleaning, doing laundry for his mother and himself, and driving. *Id.* at 1076-78.

Upon examination of the VE, the VE indicated that he responded to interrogatories posed to him outside of the hearing by Plaintiff. Tr. at 1081 (citing tr. at 1419-28). Plaintiff's second hypothetical question was the following:

7

> Please consider a younger individual under Social Security regulations with a high school education, the same past work experience as I have[4] (which was considered to be a medium level SVP-2 job with no transferable skills). For this hypothetical, the individual can lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently. This individual can sit for up to six hours in a normal eight-hour workday. This individual can stand and/or walk for six hours in a normal eight-hour workday. This individual cannot climb ladders, ropes, and scaffolds. This individual can occasionally kneel, crouch, and crawl. This individual cannot drive commercially and must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. Finally, this individual must avoid concentrated exposure to temperature extremes of hot and cold.

*Id.* at 1421. The VE submitted a response to this hypothetical question, indicating that such an individual could perform jobs in the national economy, including Cafeteria Attendant (57,000 jobs), Furniture Rental Clerk (50,000 jobs), and Sales Attendant (200,000 jobs). *Id.* at 1439. The ALJ, in his decision, relied on the VE's response to hypothetical 2. *Id.* at 1051.

## III.    **RELEVANT PORTIONS OF THE ALJ'S DECISION**

On February 4, 2014, the ALJ issued his initial decision finding that Plaintiff was not disabled. Tr. at 84-99. The ALJ stated that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. *Id.* at 90. He further found that Plaintiff had not engaged in substantial gainful activity since December 24, 2011, the alleged onset date. *Id.* Continuing, the ALJ determined that Plaintiff had the following severe impairments: status post intracerebral hemorrhage suffered on December 24, 2011 requiring hospitalization; diabetes mellitus; hypertension status post hypertensive emergency on December 24, 2011; and peripheral vascular disease of the right lower extremity. *Id.* The ALJ then indicated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 91.

After consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. §

---

[4] Plaintiff previously worked as a food quality specialist, prep cook, temporary worker, production associate at a factory, and crew trainer/grill cook. Tr. at 325. The VE objected to Plaintiff's hypothetical questions because none of them asked him to provide vocational information based upon his objective review of the record. *Id.* at 1428. The ALJ considered the VE's objections, but overruled them. *Id.* at 1430.

416.967(b)[5] with the following additional limitations: can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; can sit for six hours and stand and/or walk for six hours in a normal workday; cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally kneel, crouch, and crawl; must avoid concentrated exposure to temperature extremes of hot and cold; must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; cannot drive commercially. Tr. at 92.

The ALJ then stated that Plaintiff was unable to perform any past relevant work, was a younger individual on the alleged disability onset date, had at least a high school education, and could communicate in English. Tr. at 96-97. Next, the ALJ indicated that the transferability of jobs skill was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff was "not disabled," whether or not he has transferable job skills. *Id.* at 97. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* For these reasons, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 24, 2011. *Id.* at 98.

After the Appeals Council denied Plaintiff's request for review, Plaintiff filed a complaint in the United States District Court. *See id.* at 1177-79. The parties jointly stipulated to remand the case, which the District Court granted. *Id.*

Upon remand, the ALJ held a second hearing on February 21, 2017, and the ALJ issued a second decision on April 10, 2017, again finding that Plaintiff was not disabled. Tr. at 1028-42, 1058-1101. Specifically, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014. *Id.* at 1033. He further found that Plaintiff had not engaged in substantial gainful activity since December 24, 2011. *Id.* Continuing, the ALJ determined that Plaintiff had the severe impairments of status post intracerebral hemorrhage suffered on December 24, 2011 requiring hospitalization, diabetes mellitus, hypertension status post hypertensive emergency on December 24, 2011, and peripheral vascular disease of the right

---

[5] 20 C.F.R. § 416.901 *et seq.* governs SSI determinations, while 20 C.F.R. § 404.1501 *et seq.* governs DIB determinations. These regulations are virtually identical.

lower extremity. *Id.* He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 1034. After considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, but with the following limitations: can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; can sit for six hours and stand and/or walk for six hours in a normal workday; cannot climb ladders, ropes, or scaffolds; can occasionally kneel, crouch, and crawl; cannot drive commercially and must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; must avoid concentrated exposure to temperature extremes of hot and cold. *Id.* at 1035.

The ALJ then stated that Plaintiff was unable to perform any past relevant work, was a younger individual on the alleged disability onset date, had at least a high school education, and could communicate in English. Tr. at 1041. Next, the ALJ indicated that the transferability of jobs skill was not material to the determination because using the Medical-Vocational Rules as a framework supports a finding that the Plaintiff is "not disabled," whether or not the Plaintiff has transferable job skills. *Id.* Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* For these reasons, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from December 24, 2011 through the date of his decision. *Id.* at 1042.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to Social Security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made

without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an

ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 937 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009)) (internal citations omitted). Therefore, even if an ALJ's decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LAW AND ANALYSIS

### A.  Remand Order to Consider ODJFS Award of Disability

Plaintiff first contends that the ALJ ignored the mandate of the Federal District Court to consider the ODJFS award that found Plaintiff disabled and was entitled to benefits. ECF Dkt. # 20 at 18; *see also* tr. at 1177-83. Plaintiff argues that the ALJ ignored the remand order because the ALJ stated in his decision that the record was "unclear" and because he did not seek out additional evidence. ECF Dkt. #20 at 19-20.

The Social Security regulations provide that "[a] decision by ... any other governmental agency about whether you are disabled is based on its rules and is not our decision about whether you are disabled or blind." 20 C.F.R. §§ 404.1504, 416.904 (effective until Mar. 27, 2017). The regulations further provide that such decisions are not binding upon the SSA. *Id.* Social Security Ruling 06-03p ("SSR 06-03p"), which has been rescinded for claims filed on or after March 27, 2017[6], acknowledged these regulations, but clarified that although other agency decisions may not be binding:

> we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

---

[6] Effective March 27, 2017, SSR 06-03p, 96-2p, and 96-5p have been rescinded by Fed. Reg. Notice Vol. 82, No. 57, page 15263. These regulations are still effective for claims filed before March 27, 2017.

12

These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

Thus, despite not being binding to the Commissioner, other agency opinions regarding disability must be taken into consideration. SSR 06-03p, at *6-7; *see Lowery v. Comm'r of Soc. Sec.*, 886 F.Supp.2d 700, 718 (S.D. Ohio 2012) (An ALJ is not bound by the decision of another governmental agency, but is required to "articulate one or more reasons for rejecting that finding."). The Sixth Circuit Court of Appeals has also recognized that disability decisions by other governmental agencies must be taken into account, even though such decisions are not binding on the SSA. *See LaRiccia v. Comm'r of Soc. Sec.* 549 Fed.Appx. 377, 387-88 (6th Cir. 2013). However, the Court indicated that "the Commissioner may nonetheless find an agency's determination relevant, depending on the similarities between the rules and standards each agency applies to assess disability." *Id.* at 388 (citing SSR 06–03p, at *7).

Contrary to Plaintiff's assertion, the ALJ did not ignore the determination by the ODJFS. *See Howard v. Comm'r of Soc. Sec.*, No. 1:17-CV-152, 2018 WL 3425010, at *5 (S.D. Ohio July 16, 2018), *report and recommendation adopted*, No. 1:17-CV-152, 2018 WL 3957187 (S.D. Ohio Aug. 17, 2018) (finding that the ALJ did not ignore opinion of physician from ODJFS when ALJ "noted that the assessment was completed prior to the plaintiff's SSI filing date; it was not supported by the medical evidence of record; and the limitations provided were not well-defined"). In his April 10, 2017 decision, the ALJ specifically acknowledged that the case was remanded because he did not consider the opinion from the ODJFS finding. Tr. at 1040. He further stated that "[i]t is unclear from the record what exactly [the ODJFS] finding was based

13

on, but it included all of the medical evidence in the record for the relevant time period as well as Dr. Dhyanchand's opinions." *Id.* The ALJ's opinion that the ODJFS relied heavily on Dr. Dhyanchand's opinion appears to stem from the fact that Dr. Dhyanchand completed a form from the Summit County Department of Jobs and Family services entitled "Request for Employability Information." *Id.* at 604-06. Ultimately, the ALJ afforded little weight to such finding for the same reasons he discounted Dr. Dhyanchand's opinions, which is discussed later in this report. *Id.* The aforementioned reasons and the reasons to discount Dr. Dhyanchand's opinions, by incorporation, show that the ALJ did consider the ODJFS determination and did not ignore it.

Plaintiff further contends that the ALJ had a duty to obtain additional information about the ODJFS disability determination. ECF Dkt. #20 at 18-19; ECF Dkt. # 26 at 2-3. In particular, Plaintiff avers that the ALJ failed to subpoena records that were filed with ODJFS, failed to issue a subpoena for an agency representative to testify and explain the rationale, and failed to make reference to the applicable provisions of the Ohio Administrative Code that governs ODJFS and the DFA program. ECF Dkt. #26 at 2-3.

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. *Trandafir v. Comm'r of Soc. Sec.*, 58 Fed.Appx. 113, 115 (6th Cir. 2003) (citing 20 C.F.R. § 404.1512(a)). Under certain circumstances, an ALJ has a special, heightened duty to develop the record, but only when a claimant is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed.Appx. 456, 459 (6th Cir.2008) (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir.1983)). There is no bright line rule for determining when an ALJ has a special duty to fully develop the record, and the determination must instead be made on a "case by case basis." *Lashley*, 708 F.2d at 1052. To satisfy this special duty when it applies, the ALJ "must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,'" and he "must be 'especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.'" *Id.* at 1051 (quoting *Gold v. Sec. of Health, Education and Welfare*, 463 F.2d 38, 43 (2d Cir. 1972) *quoted in Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). In *Maier v. Comm'r of Soc. Sec.*, No. 2:14-CV-1440, 2015 WL 1611394,

14

at *4 (S.D. Ohio Apr. 10, 2015), the Court ordered a remand and found that the ALJ had a heightened duty to develop the record with regard to plaintiff's assertion that he had been awarded state disability financial assistance "[i]n light of the [ALJ's] requirement to consider state agency disability determinations, plaintiff's status as a pro se claimant, and his unfamiliarity with hearing procedures." 2015 WL 1611394, at *4. In *Wilson*, the Sixth Circuit found that even though the plaintiff "chose to proceed without counsel, the hearing transcript disclosed her grasp of the proceedings and the adequacy of her case presentation to the ALJ." 280 Fed.Appx. at 459.

In the instant case, Plaintiff fired his counsel on August 23, 2013 and waived representation, and subsequently proceeded pro se, both in his initial proceeding and after his case was remanded. Tr. at 214-15, 257. Although without counsel, there is no indication that Plaintiff was "incapable of presenting an effective case" or "unfamiliar with hearing procedures." *Wilson*, 280 Fed.Appx. at 459. Rather, Plaintiff was able to persuade the Commissioner to stipulate to remand his case when it first appeared in federal court and has been active in his case by filing interrogatories, attending both ALJ hearings without counsel, and filing briefs and motions. *See* tr. at 1058, 1104, 1177-79, 1202-37, 1419-27. To note, Plaintiff even earned a paralegal certificate in 2007. *Id.* at 325. Accordingly, the ALJ was not under a special duty to develop the record.

Furthermore, upon remand, the ALJ sent a letter dated September 7, 2016 to Plaintiff requesting "any and all evidence" regarding the ODJFS determination. Tr. at 1201. The ALJ also stated in this letter that he would request from ODJFS the records it used to award Plaintiff benefits as well as an explanation of the criteria they used in determining whether Plaintiff should receive such benefits or otherwise would subpoena the records in lieu of Plaintiff signing a release. *Id.* Plaintiff responded to the ALJ's letter on September 12, 2016, and attached copies of documents related to his disability determination by the ODJFS, which consisted mostly of medical records already on file. *See id.* at 1303-99. Included in these documents was the ODJFS determination awarding disability benefits, dated May 8, 2013. *Id.* at 1322-28. Plaintiff also clarified in his letter that ODJFS relied on the Ohio Administrative Code Rules 5101:1-2-10 and 5101:1-38-01.8 and that the decision came after a court case was filed in the Summit County

Court of Common Pleas, *In State ex rel. Derrick M. King v. Summit County Department of Job and Family Services*, Case No. CV-2013-03-1615. *Id.* at 1303-04. Plaintiff included a docket listing the documents that were filed in such case. *Id.* at 1304-05.

On September 28, 2016, Plaintiff requested the ALJ to issue subpoenas to 5 medical doctors to instruct them to complete a set of interrogatories. *Id.* at 1202-04. Plaintiff further advised that he had previously submitted records from ODJFS and was requesting a status update from the ALJ. *Id.* at 1204. In a letter dated September 29, 2016, the ALJ responded that granted the request to issue all of the interrogatories and that he felt that the evidence Plaintiff offered was sufficient but he would consider a subpoena if Plaintiff informed him of additional evidence from ODJFS that Plaintiff felt was necessary. *Id.* at 1238. In a letter dated December 8, 2016, the ALJ notified Plaintiff of the additional evidence that he secured and proposed to enter into the record, which included the responses to the 5 sets of interrogatories that were sent to the doctors. *Id.* at 1400. At the February 21, 2017 hearing, the ALJ reiterated that he felt that he had ample evidence regarding the ODJFS determination. *Id.* at 1097. Given the fact that Plaintiff bore the burden to prove disability and, in fact, submitted a substantial amount of evidence regarding the ODJFS determination, the undersigned recommends that the Court find that the ALJ did not have a heightened duty to develop the record and did not commit error by refusing to issue subpoenas for further records regarding the ODJFS decision because he already had sufficient evidence from Plaintiff.

To summarize, in light of the substantial-evidence standard, the undersigned recommends that the Court find that: (1) the ALJ did not ignore or fail to consider the ODJFS decision; and (2) the ALJ did not have a legal duty to obtain further evidence because he did not have a heightened duty to develop the record and because Plaintiff already submitted pertinent and ample evidence on the matter.

### B.    Treating Physician Rule

Plaintiff next asserts that the ALJ failed to adhere to the treating physician rule by giving little weight to the opinions of Carol Little, Dr. Roberto Lebron, and Dr. Charles Dhyanchand.

16

ECF Dkt. #20 at 19-21. For the following reasons, the undersigned recommends that the Court find Plaintiff's second main contention is without merit.

An ALJ must give controlling weight to the opinion of a treating source[7] if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2)[8]; *Price v. Comm'r Soc. Sec. Admin.*, 342 Fed.Appx. 172, 175-76 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 404.1527(d)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)). Although an ALJ must "consider" all of the factors in 20 C.F.R. § 404.1527(d) and must "apply" the factors listed in 20 C.F.R. § 404.1527(d)(2), including its subsections, through (d)(6) to determine the weight to give that opinion, he is not required to discuss every factor in his decision as long as he provides "good reasons." *See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *5 (1996)[9]; 20 C.F.R. § 404.1545(a)(2); *Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to

---

[7] The undersigned notes that the SSA has changed the treating physician rule for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," available at https://www.ssa.gov. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

[8] Given that Plaintiff filed for DIB in January 2012 and SSI in February 2012, an earlier version of this section applies. 20 C.F.R. § 404.1527 (effective until March 26, 2012). Because these sections for DIB and SSI are identical and for convenience, the undersigned will only cite to 20 C.F.R. § 404.1527, even though 20 C.F.R. § 416.927 also applies.

[9] *See supra* note 6.

stand."); *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed.Appx. 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis.") (internal citation omitted).

Under the "good reasons" rule, the ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, at *5. This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010). If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544); *Parks v. Social Sec. Admin.*, 413 Fed.Appx. 856, 864 (6th Cir. 2011).

### 1.    **Occupational Therapist Carol Little**

Contrary to Plaintiff's assertions, occupational therapist Carol Little's opinion is not entitled to treating physician deference. At one point, the ALJ even notified Plaintiff of the fact that physical therapists are not acceptable medical sources under the regulations in a letter dated January 15, 2014. Tr. at 255 (citing to 20  C.F.R. § 404.1527 and SSR 06-03p). 20 C.F.R. § 404.1527(f) governs opinions from medical sources who are not acceptable medical sources and from nonmedical sources, which encompasses occupational therapists. 20 C.F.R. § 416.913(a)

18

& (d)(1) (effective June 3, 2011 to Sept. 2, 2013); *see LaRiccia v. Comm'r of Soc. Sec.*, 549 Fed.Appx. 377, 385 (6th Cir. 2013) (noting that an occupational therapist is not an acceptable medical source and, therefore, cannot be a treating source); *Gardenhouse v. Comm'r of Soc. Sec.*, No. 1:14-CV-96, 2015 WL 1458163, at *9 (W.D. Mich. Mar. 30, 2015) (noting that occupational therapists are not acceptable medical sources); *Perschka v. Comm'r of Soc. Sec.*, 411 Fed. Appx. 781, 787 (6th Cir. 2010) (noting that the regulations state that a physical therapist is not an acceptable medical source); *Engebrecht v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 392, 399 (6th Cir. 2014) (The opinion of a therapist "is not properly classified as an 'acceptable medical source' opinion but is an 'other source' opinion" under the regulations.").

An ALJ generally should explain the weight given to opinions from medical sources who are not acceptable medical sources, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of a case." SSR 06-03p, at *6. The Sixth Circuit interpreted this ruling to mean that an ALJ should discuss the 20 C.F.R. § 404.1527(d) factors relating to treatment, in order to provide a basis for why the ALJ was rejecting the opinion. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) ("The factors set forth in 20 C.F.R. § 404.1527, which under the regulation apply only to medical opinions from acceptable medical sources, nevertheless 'represent basic principles that apply to the consideration of all opinions from medical sources ... who have seen the individual in their professional capacity.'") (citing SSR 06-3p). However, an ALJ does not need to provide "good reasons" for rejecting the opinions of nonacceptable medical sources, including occupational therapists. *See* 20 C.F.R. § 404.1527(d)(2) ("good reasons" are only required when an ALJ provides less than controlling weight to a treating source's medical opinion); *Leach v. Comm'r of Soc. Sec.*, No. 3:13 CV 2037, 2015 WL 1221925, at *3 (N.D. Ohio Mar. 17, 2015) (noting that the regulations do not require the same heightened "good reasons" analysis for "other sources" that applies to the opinions of acceptable medical sources).

19

The record shows that Ms. Little only evaluated Plaintiff once on August 18, 2016 and for the purpose of conducting a FCE. *See* tr. at 1931. The ALJ in the instant case considered Ms. Little's opinion and discussed primarily the supportability factor of § 404.1527(d). *See* tr. at 1040. The ALJ gave "little weight to Ms. Little's limits with standing and walking as they are not supported by her own exam." *Id.* The ALJ further noted that Ms. Little admitted that she felt that Plaintiff did not give maximum effort, which called into question the results of her evaluation. *Id.*; *see* tr. at 1941, 1944. Continuing, the ALJ reasoned that:

> the limits with standing and walking [Ms. Little] offered are not supported by the objective medical evidence of record, the other opinions that show no limits with standing and walking, and the [Plaintiff's] extensive daily activities including his ability to drive, care for his pets, care for himself, and help care for his mother.

*Id.* at 1040.

The ALJ provided similar support elsewhere in his decision. The Sixth Circuit has endorsed supporting a conclusion in a particular step of the ALJ's decision by looking to factual findings elsewhere in that decision. *See generally Forrest v. Comm'r of Soc. Sec.*, 591 Fed.Appx. 359, 365-66 (6th Cir. 2014) (finding that the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three); *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a step three medical equivalency determination). In relevant part, the ALJ noted that Plaintiff's daily activities he admitted to "coupled with the relatively benign medical evidence suggest he could stand and walk anough to perform light work" and that Plaintiff admitted that he could obtain a job that would allow him to sit most of the day. Tr. at 1038. The ALJ noted that there was no evidence Plaintiff ever had to use a cane or walker for his standing and walking issues. *Id.* Additionally, he gave weight to the opinion of Dr. Perencevich, who opined that Plaintiff could sit and stand and/or walk for six hours in a normal workday. *Id.* at 1039. He also considered physical therapist David Skranjer's opinion that Plaintiff "might have issues with standing and walking because of claudication" but nevertheless "placed [Plaintiff] at the light level for standing and walking because the medical evidence shows mostly mild findings and because the [Plaintiff's] daily activities, by his own admission, are virtually the same now as they were prior to his intracerebral

20

hemorrhage." *Id.* at 1039-40. Accordingly, the undersigned recommends that the Court find that the ALJ (1) was not required to apply the treating physician rule to Ms. Little's opinion; (2) properly considered her opinion; and (3) did not err in affording her opinion little weight.

### 2.    Dr. Roberto Lebron

Dr. Lebron has been Plaintiff's treating physician since September 11, 2015. Tr. at 1859; ECF Dkt. #20 at 10. Although the record contains progress notes from Dr. Lebron, Dr. Lebron did not provide a medical opinion as to Plaintiff's functional limitations or employability. In October 2016, Dr. Lebron completed responses to an interrogatory form from Plaintiff, but he offered no specific opinions on his functional capacity and instead handwrote a note in the margin stating "Please refer to functional capacity assessment" for questions 11 through 24. Tr. at 2164-71. Consequently, in his decision, the ALJ simply stated: "At Exhibit 33F, Dr. Lebron offered no limits and instead directed reference to the Functional Capacity Evaluation by Ms. Little discussed above." *Id.* at 1040. By deferring the functional limitation questions in the interrogatory to a separate assessment, the ALJ found that Dr. Lebron, in essence, did not provide any opinion as to Plaintiff's limitations. *Id.* Also, Ms. Little's assessment was made from her own observations, with no reference to medical records of any of Plaintiff's doctors, including Dr. Lebron. *See id.* at 1931-43.

To the extent Dr. Lebron adopted Ms. Little's opinion as her own, the ALJ discounted Dr. Lebron's opinion for same reasons he discounted Ms. Little's opinion. Tr. at 1040. District Courts within this Circuit have treated opinions co-signed by a physician as opinions of that physician. *See Brown v. Comm'r of Soc. Sec.*, No. 5:14CV940, 2015 WL 4275556, at *11-12 (N.D. Ohio July 14, 2015) ("Although the issue has yet to be addressed by the Sixth Circuit, prior decisions have held that a doctor's co-signature indicates at a minimum that the doctor agrees with the other sources opinion ...[i]t follows then, that if the signing physician or psychologist has personally examined the claimant, the opinion must be treated as the doctor's own."); *Pater v. Comm'r of Soc. Sec.*, No. 1:15CV1295, 2016 WL 3477220, at *7 (N.D. Ohio June 27, 2016) ("Under the law, there is no difference between opinions filled out and signed by a treating psychiatrist and opinions filled out by a social worker and then signed—thus adopted—by a treating

psychiatrist.") (internal quotations omitted); *Rueda v. Berryhill*, No. 1:17CV1878, 2018 WL 3304626 (N.D. Ohio June 22, 2018), *report and recommendation adopted sub nom. Rueda v. Comm'r of Soc. Sec.*, No. 1:17CV1878, 2018 WL 3302928 (N.D. Ohio July 5, 2018) (same). Although, Dr. Lebron did not co-sign the FCE form that Ms. Little completed, he vaguely referred to it in the only document in the record that can be considered an "opinion" document of Dr. Lebron.

The undersigned recommends that the Court consider Dr. Lebron's response to Plaintiff's interrogatory form as so devoid of substance that it should not be treated as an opinion. If the Court decides to consider Dr. Lebron's response as sufficient to constitute a medical opinion, then the undersigned recommends that the Court find that the ALJ provided good reasons to discount it. Even a one sentence explanation for discounting a treating physician's opinion can suffice under the good reasons requirement. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (ALJ's one -sentence justification for discounting treating physician's opinion "reach[ed] several of the factors that an ALJ must consider," and satisfied good reasons requirement. (citations omitted)). Here, the ALJ specifically noted that Dr. Lebron did not provide any limitations and that he merely referenced Ms. Little's evaluation, which the ALJ afforded only little weight. Tr. at 1040. As discussed in the previous section, the ALJ found that Ms. Little's limits were not supported by her own exam and the rest of the record. *Id.*

### 3.    Dr. Charles Dhyanchand

The ALJ gave mixed weight to Dr. Dhyanchand's opinion. First, the ALJ noted that Dr. Dhyanchand completed a form on behalf of the Summit County Department of Jobs and Family Services in February 2012 in which he indicated that Plaintiff could not return to any level of work. Tr. at 1039. However, the ALJ noted that Dr. Dhyanchand also felt that Plaintiff could attend school, undertake skills training, attend vocational rehabilitation, search for jobs, and perform volunteer work. *Id.* (citing tr. at 604). The ALJ also referenced a similar form Dr. Dhyanchand completed contemporaneously in which Dr. Dhyanchand found no exertional or non-exertional limitations and felt that Plaintiff was "employable." *Id.* (citing tr. at 606). The ALJ gave "weight" to Dr. Dhyanchand's opinion that Plaintiff was "employable." *Id.* He reasoned that

while it was vague, the opinion was consistent with the form Dr. Dhyanchand filled out expressing that Plaintiff did not have any significant limitations. *Id.* The ALJ also found that this opinion was consistent with the other opinion evidence of record and with Dr. Dhyanchand's own progress notes, which showed issues with hypertensive and diabetic control but no end organ damage or resulting physical limitations. *Id.*

Second, the ALJ decided to give "little weight" to Dr. Dhyanchand's opinion that Plaintiff could not return to any level of work because it was inconsistent with his "employable" opinion from roughly the same period and also inconsistent with his finding that Plaintiff could attend school and vocational rehabilitation. Tr. at 1039. The ALJ also stated that there is nothing in Dr. Dhyanchand's progress notes that suggests Plaintiff could not perform light work. *Id.* The ALJ also highlighted an issue in Exhibit 34F (Plaintiff's November 22, 2016 interrogatory to Dr. Dhyanchand) in which Dr. Dhyanchand wrote that he could not provide a RFC or otherwise determine Plaintiff's limitations because of a note that said: "unable to complete remainder of form due to no evidence in chart, such as FCE, to support." *Id.* at 1039, 2192. The ALJ pointed out that there actually was a FCE in the file. *Id.* at 1039. To note, there appears to be at least two separate FCEs in the record at the time Dr. Dhyanchand responded to the interrogatory form, which were performed by physical therapist David Skrajner on August 14, 2013 and by Carol Little on August 18, 2016, as previously discussed. *Id.* at 639-47, 1039-40, 1931-46.

The ALJ only limited Dr. Dhyanchand's opinion insofar as it concerns his opinion that Plaintiff could not return to any level of work. Tr. at 1039. The ALJ's analysis of Dr. Dhyanchand's opinion focused on the consistency and supportability factors of 20 C.F.R. § 1527(d). Given the substantial evidence standard, the undersigned recommends that the Court find that the ALJ provided substantial reasons to discount part of Dr. Dhyanchand's opinion and did not violate the treating physician rule because he provided "good reasons" to limit his opinion.

### C. Step Five

Plaintiff's third assignment of error is that the Respondent did not meet its burden at Step Five of the sequential process due to: (1) the ALJ's use of an improper hypothetical; (2) the VE's

lack of credibility regarding his use of the Dictionary of Occupational Titles ("DOT") in place of the Standard Occupational Code and the Occupational Information Network ("O*NET"); and (3) the VE's reference to an "incorrect" number of jobs that exist in the national economy. ECF Dkt. #20 at 21.

Plaintiff's first reason is not well taken. Plaintiff's merits brief does not set forth any arguments regarding what exactly was improper about the "hypothetical in [the ALJ's] decision." ECF Dkt. #20 at 21-22. In fact, during the February 21, 2017 hearing, the ALJ explicitly relied on Plaintiff's own hypothetical questions used in the interrogatories that Plaintiff sent to the VE. Tr. at 1081-82. The ALJ did not pose any of his own hypothetical questions, stating: "Mr. King, based on the thoroughness of the number of hypotheticals in your interrogatories, I don't have any additional questions for [the VE]." *Id.* at 1084; *see also id.* at 1085 (same). In his April 10, 2017 decision, the ALJ explicitly stated that he relied on Plaintiff's interrogatories. *Id.* at 1041-42 ("To determine the extent to which these limitations erode the unskilled light occupational base, I allowed the claimant to submit interrogatories to the vocational expert asking whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]."). The ALJ then cited to the VE's responses and relied on his answers to the second hypothetical question from Plaintiff's set of interrogatory questions. *Id.* at 1042, 1439. Given that Plaintiff did not present an argument about what was improper and because the "improper hypothetical in [the ALJ's] decision" was Plaintiff's own hypothetical question, the undersigned recommends that the Court find Plaintiff's first reason is without merit.

Plaintiff's second and third reasons are interrelated. Plaintiff argues that the VE's testimony was not credible because he relied solely on the DOT and not other sources and because he referred to an "incorrect" number of jobs that exist in the national economy. ECF Dkt. #20 at 22. Plaintiff correctly points out that the DOT was last updated in 1991. OFFICE OF THE INSPECTOR GEN., SOC. SEC. ADMIN., THE SOCIAL SECURITY ADMINISTRATION'S EFFORTS TO DEVELOP ITS OWN SOURCE OF OCCUPATIONAL INFORMATION FOR USE IN ITS DISABILITY PROGRAMS 2 (June 2018), https://www.oversight.gov/sites/default/files/oig-reports/A-01-15-15035.pdf [hereinafter SSA 2018 Report]. Consequently, the DOT still includes

occupations that no longer exist and excludes occupations that exist today. *Id.* at 2-3. In 1998, the Department of Labor replaced the DOT with O*NET, but the SSA and other agencies found that O*NET and other similar systems "would require significant modification to meet the needs of its disability programs." *Id.* at 3. Since 2008, the SSA has been developing its own source of occupational information, called the Occupational Information System ("OIS"), which the SSA endeavors to implement sometime in 2020. *Id.* at 3, 7, 10; *see* Establishment of the Occupational Information Development Advisory Panel, 73 FR 78864-01, 2008 WL 5329223 (Dec. 23, 2008). Until such time, the current regulations remain. SSR 00-4p provides in relevant part that:

> The regulations at 20 CFR 404.1566(d) and 416.966(d) provide that we will take administrative notice of "reliable job information" available from various publications, including the DOT.
> ...
>
> In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.
> ...
> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000); *see* 20 CFR §§ 404.1566(d)(1), 416.966(d)(1). Although the Sixth Circuit has not definitively resolved the issue, courts in this circuit have generally found that an ALJ's failure to comply with SSR 00-4p can constitute either reversible or harmless error. *E.g.*, *Townsend v. Comm'r of Soc. Sec.*, No. 1:17-CV-2218, 2018 WL 5808745, at *8 (N.D. Ohio Nov. 6, 2018); *Harrington v. Comm'r of Soc. Sec.*, No. 1:14CV1833, 2015 WL 5308245, at *7 (N.D. Ohio Sept. 10, 2015); *Bratton v. Astrue*, No. 2:06-0075, 2010 WL 2901856, at *4 (M.D. Tenn. July 19, 2010).

During the February 21, 2017 hearing, the ALJ inquired of the VE as follows: "Do you understand if you give us an opinion that conflicts with the information in the Dictionary of Occupational Titles we would ask that you advise us of that conflict and explain the basis for your opinion?" Tr. at 1081. The VE responded that he understood. *Id.* Later during the hearing, the

Plaintiff questioned the VE if he was familiar with O*NET, to which the VE responded "Yes." *Id.* at 1089. Plaintiff then questioned the VE about the amount of time standing and walking per day for the jobs of furniture rental clerk, sales attendant, and cafeteria attendant. *Id.* at 1089-90. The VE stated that he based his responses about standing and walking "on job placement with working individuals in those jobs." *Id.* at 1090. The VE went further and stated that there are other sources out there, such as the one Plaintiff mentioned (O*NET), "that talk about specific amount of times that claimants allege standing and walking, but those are based on self-perceptions." *Id.* at 1090-91. The VE clarified that his testimony is supposed to be based on professional, impartial, and objective evidence and that he preferred not to use sources that rely on self-perceptions, which are not objective. *Id.* at 1091-92. However, the VE admitted that, at times, VEs use O*NET in their work. *Id.* at 1092.

Upon questioning by Plaintiff, the VE testified that he was "somewhat" familiar with O*NET, which he stated is one of a number of different systems that provides job data and which classifies jobs according to specific types of codes. *Id.* at 1092-93. The VE further explained that although thought to be an "up-and-coming" system, O*NET was "not utilized nearly as much as it was 15 years ago." *Id.* at 1093. The VE further stated that O*NET is still sometimes used by other VEs and that he uses it about 25-30% of the time. *Id.*

Plaintiff began to discuss Social Security policy and issues about the Administration's adoption of O*NET over the DOT. *Id.* at 1093-94. The ALJ interrupted, stating that whether or not the Administration would adopt O*NET was not relevant to the VE's classification of jobs. *Id.* at 1094. The ALJ stated that they were dealing with the VE's knowledge of "that system" (presumably O*NET) and Plaintiff's questions regarding the reliability of "that system." *Id.* Subsequently, Plaintiff only asked about providing "local or state numbers," and the ALJ clarified that the VE was only required to provide national numbers. *Id.* at 1094-95. There was no further questioning about the reliability of either the DOT or O*NET. *Id.* at 1095.

The VE did not report any conflicts between his testimony and the DOT. Since the VE identified no conflicts, the ALJ could rely on his testimony, especially since Plaintiff was given a full opportunity to cross-examine the VE in this case and indeed did so. *See* tr. at 1085-95. The

Sixth Circuit has held that "nothing in the applicable Social Security regulations requires the administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 Fed.Appx. 746, 757 (6th Cir.2008) (citing *Martin v. Comm'r of Soc. Sec.*, 170 Fed.Appx. 369, 374-375 (6th Cir. 2006)); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009); *Isaac v. Colvin*, No. 3:13-CV-125, 2014 WL 2931579, at *13 (S.D. Ohio June 27, 2014) (citing *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 158 (6th Cir. 2009)) (There is "no duty articulated in the Regulations, or by the Sixth Circuit, requiring the ALJ to inquire as to whether the DOT classifications are consistent with other publications."); SSR 00–4p, at *2 (requiring the ALJ to elicit a reasonable explanation when there is an apparent, unresolved conflict between the VE and the DOT). Therefore, the undersigned recommends that the Court find that the ALJ committed no error because the VE and the ALJ properly adhered to the regulations by relying on the DOT.

Moreover, although the DOT still prevails under the regulations, some courts in this Circuit and others have remanded cases when the DOT job descriptions relied upon are severely outdated or obsolete, for example, when DOT job figures provided are for occupations that no longer exist. *E.g.*, *Cunningham v. Astrue*, 360 Fed.Appx. 606, 615 (6th Cir. 2010) ("While the Social Security Commissioner does take administrative notice of the [DOT] when determining whether jobs exist in the national economy, 20 C.F.R. § 404.1566(d)(1), common sense dictates that when such descriptions appear obsolete, a more recent source of information should be consulted.") (unpublished opinion); *Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015) (remanding after finding it "hard to believe" the VE's testimony that there were 200,000 jobs for the DOT occupation of "addresser"); *Moore v. Berryhill*, No. 4:17-CV-00091-HBB, 2018 WL 1323127, at *11-13 (W.D. Ky. Mar. 14, 2018) ("[T]he discrepancies between the DOT and O*NET present sufficient doubt as to the reliability of the vocational expert's testimony [regarding the occupations of mail clerk, agricultural produce sorter, and small products assembler] to warrant a conclusion that the ALJ's step five determination was not supported by substantial evidence."); *Bowles v. Colvin*, No. 3:13-CV-801-JEM, 2015 WL 1129173, at *7 (N.D.

Ind. Mar. 11, 2015) (expressing concern about the ALJ's acceptance, without comment, of the VE's testimony about job incidence "where several of the jobs described by the VE-notably, that of microfilm document preparer-seem likely to have changed or disappeared in the 37 years given new document storage methods"); *Kane v. Colvin*, No. 2:13-CV-00131-JEM, 2014 WL 4829622, at *10 (N.D. Ind. Sept. 29, 2014) (expressing doubt about the continued use of "[t]he job of cutter-and-paster [which] is one that seems particularly likely to have changed or disappeared in the last 37 years given the shift to online publication"). Nevertheless, a District Court in this Circuit explained that, "[a]lthough *Cunningham* suggested that the particular DOT job descriptions at issue—document preparer and security camera monitor—may have been obsolete, it did not hold that the DOT is an unreliable or out-of-date source." *Earls v. Comm'r of Soc. Sec.*, 1:09CV01465, 2011 WL 3652435, at *7 (N.D.Ohio Aug.19, 2011). In order to determine whether occupation information listed in the DOT is obsolete or outdated to warrant a remand, some courts have undergone a thorough comparison of the job description as it is listed in the DOT with its description in O*NET. *See, e.g.*, *Cunningham*, 360 Fed.Appx. at 614-16; *Moore*, 2018 WL 1323127, at *11-13.

Here, Plaintiff's contention focuses on the number of jobs available nationally rather than the job descriptions. ECF Dkt. #20 at 23-26. Plaintiff relied on O*NET statistics from 2014[10], which he submitted into evidence. *Id.* at 23. For "cafeteria attendant" (DOT 311.677-010, SOC/O*NET 35-9011), the VE, relying on the DOT, posited that there were approximately 57,000 jobs available nationally. Tr. at 1439. For "furniture rental clerk" (DOT 295-357-018, SOC/O*NET 41-2021), the VE, relying on the DOT, posited that there were approximately 50,000 jobs available nationally. *Id.* at 1439. And for "sales attendant" (DOT 299.677-010, SOC/O*NET 41-2031), the VE, relying on the DOT, posited that there were approximately 200,000 jobs available nationally. *Id.* at 1439.

---

[10] Although Plaintiff noted that he used a version of the "National Occupational Employment and Wage Estimates" from May 2015, the exhibits show that the employment figures themselves are derived from the previous year, 2014. *See* tr. at 1768, 1776, 1805.

Plaintiff contends that the VE actually *underestimated* the number of available jobs for each of the three occupations. ECF Dkt. #20 at 23. Specifically, Plaintiff argues that the VE underestimated the number of positions for "cafeteria attendant" by 350,000[11] jobs, only accounted for 11.8%[12] of jobs for "furniture rental clerk," and only accounted for 4.3%[13] of jobs for "sales attendant." *Id.* Plaintiff acknowledges that the number of available jobs was more than the VE stated in the written interrogatories, but he argues that this "calls into question the credibility" of the VE's findings. *Id.* Plaintiff is correct in that the employment figures are significantly different between what the VE provided and the particular version of O*NET that Plaintiff relied upon. However, this Circuit still follows the regulations providing that the VE and ALJ should rely primarily on the DOT. SSR 00-4p; *see Earls v. Comm'r of Soc. Sec.*, 1:09CV01465, 2011 WL 3652435, at *7 (N.D.Ohio Aug.19, 2011). Also, given the fact that all three occupations have higher figures for available opportunities nationally, according to O*NET, the undersigned recommends that the Court find that Plaintiff's second and third reasons of how Defendant failed to meet the Step Five burden are without merit. Even if the Court were to hold otherwise, such a discrepancy would constitute harmless error because the numbers the VE cited still amount to "significant numbers" of available jobs in the national economy. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905-06 (6th Cir. 2016) (finding 6,000 jobs nationwide was "significant"); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed.Appx. 574, 579 (6th Cir.2009) (2,000 jobs sufficed to be "significant"); *see also Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir.2009) (collecting cases to conclude "it appears to be well-established that 1,000 jobs is a significant number"); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir.1988) (500 jobs); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir.1989) (1,266 jobs).

---

[11] This figure is slightly incorrect because the 57,000 figure provided by the VE subtracted from the 2014 O*NET employment figure of 415,000 comes out to 358,000. Tr. at 1439, 1776.

[12] This figure is slightly incorrect because the 50,000 figure provided by the VE divided by the 2014 O*NET employment figure of 442,000 comes out to 11.3%. Tr. at 1439, 1768.

[13] This figure is correct because the 200,000 figure provided by the VE divided by 2014 O*NET employment figure of 4,625,000 comes out to 4.3%. Tr. at 1805.

29

### D.     Constitutionality of SSA's use of the DOT

Plaintiff's final argument is that the regulations (20 C.F.R. §§ 404.1567, 404.1568, 416.967, 416.968) that require the ALJ to rely primarily on the DOT in the Step Five analysis violate his Due Process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution primarily because of its "questionable current value." ECF Dkt. #20 at 26-27.

The right to procedural Due Process applies in Social Security cases. *See, e.g.*, *Richardson v. Perales*, 402 U.S. 389 (1971); *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786 (6th Cir. 2018). Both the Social Security Act and Due Process require that a claimant receive meaningful notice and an opportunity to be heard before his claim for disability benefits can be denied. *Stoner v. Sec'y of Health & Human Servs.*, 837 F.2d 759, 760–61 (6th Cir. 1988) (citing *Parker v. Califano*, 644 F.2d 1199 (6th Cir.1981)); 42 U.S.C. § 405(b); *see also Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.') (internal citations omitted); *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996) ("Due process requires that a social security hearing be 'full and fair.'") (internal citations omitted).

Plaintiff's sole Due Process contention focuses on the Social Security regulations' requirement that the ALJ should rely primarily on the DOT at Step Five; he does not allege any Due Process defects regarding the hearing before the ALJ. ECF Dkt. #20 at 26-28; ECF Dkt. #26 at 5-6. Defendant is required under the Social Security Act to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." 42 U.S.C. § 405(a); *see Richardson*, 402 U.S. at 409-10. The ALJ may also receive evidence at any hearing, even if "inadmissible under the rules of evidence applicable to court procedure." 42 U.S.C. § 405(b)(1).

To note, Plaintiff specifically challenges the constitutionality of 20 C.F.R. §§ 404.1567, 1568, 416.967 and 416.968. ECF Dkt. #20 at 26. Sections 404.1567 and 416.967 merely state that such sections afford the same definitions for different levels of work (e.g., "sedentary work," "light work," etc.) as the DOT. Sections 404.1568 and 416.968 do not even refer to the DOT

30

explicitly, but rather state that the Defendant uses materials published by the Department of Labor when classifying an occupation as unskilled, semi-skilled, or skilled. Despite Plaintiff's mischaracterization of these sections, he does ultimately mention SSR 00-4p, which refers to different sections that Plaintiff did not point to (20 CFR §§ 404.1566(d) and 416.966(d)) and which states that: "In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy." SSR 00-4p, at *2. Referring to the DOT, one federal district court even stated that "there is no due process violation where . . . the alleged violation stems from the use of a governmental publication that is authorized by regulation." *Thompson v. Berryhill*, No. 2:16-CV-1182 BCW, 2018 WL 1568760, at *2 (D. Utah Mar. 29, 2018). Accordingly, the undersigned recommends that the Court find that Plaintiff's Due Process rights were not violated by the ALJ's adherence to the regulations.

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: October 31, 2019                    */s/George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).